UNITED STATES DISTRICT COURT
For the Southern District of Mississippi
SOUTHERN DIVISION



THERESA FORTENBERRY and
TRALVIS FORTENBERRY d/b/a
CARING HANDS PERSONAL CARE HOME

PLAINTIFFS

VS.    Civil Action No. 1:16cv320LG-RHW

CITY OF WIGGINS, MISSISSIPPI

DEFENDANT

## COMPLAINT
### (JURY TRIAL DEMANDED)

COME NOW Plaintiffs, Theresa D. Fortenberry and Tralvis Fortenberry d/b/a Caring Hands Personal Care Home by and through their attorneys of record, Rushing & Guice, PLLC, and would show unto the Court the following, to wit:

### PARTIES

1.

Plaintiffs, Theresa D. Fortenberry and Tralvis Fortenberry d/b/a Caring Hands Personal Care Home (hereinafter "Fortenberry"), are adult resident citizens of Harrison County, Mississippi, residing at 101 S. Kern Drive in Gulfport, MS.

2.

Defendant, City of Wiggins, Mississippi (hereinafter "Wiggins"), is a municipality/municipal corporation existing under the laws of the State of Mississippi, which may be served with process in the time and manner provided by law through service on its mayor or municipal clerk.

## JURISDICTION AND VENUE

3.

Jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1331. Venue is proper in this Court as all pertinent actions or occurrences took place within the Southern District of Mississippi and Defendant Wiggins is located therein.

## FACTS

4.

On June 1, 2015, Fortenberry leased property at 918 Parkway Drive, Wiggins, MS for the purpose of operating a personal care home (hereinafter collectively "the Property"). The Property is located adjacent to an R-1 district as defined by the Land Development Code Ordinance (hereinafter the "Ordinance") of Wiggins. The Property has a natural buffer zone of trees and shrubs surrounding the property. The intended residents of the personal care home are members of a protected class as they (1) have a physical or mental impairment that substantially limits one or more major life activities, such as performing manual tasks, walking, seeing, hearing, speaking, or personal care; (2) have a record of having such an impairment, whether or not the impairment still exists; or (3) are regarded as having such an impairment, whether or not the perception is accurate.

5.

Fortenberry intended to operate a personal care home on the Property. According to the plain reading of the applicable zoning laws, Fortenberry's intended use was fully allowed.

6.

In anticipation of the business Fortenberry made significant investments into the Property, including expensive renovations and the purchase of equipment totaling over $40,000.00. However, as Fortenberry began seeking an occupancy permit for the business, problems with Wiggins began to arise even though Fortenberry was entitled to a Certificate of Occupancy in accordance with the Ordinance. Wiggins fabricated an issue regarding the requirement of fencing in order to

discriminate against persons with disabilities. The Ordinance which Wiggins relied upon provides as follows:

> 5.3.7 Required Screening for the Protection of Residential Areas
>
> A. Intent. This section requires screening to be provided and maintained when nonresidential uses are being developed or expanded adjacent to residential uses and when higher density residential uses are being developed or expanded adjacent to lesser density residential uses.
>
> B. Required Screens. All commercial or industrial uses which are located adjacent to a lot zoned A-R, R-1, or R-2, R-3, R-4 shall be provided with screening conforming to the design standards outlined below. Exempt are schools and churches. The Land Code Administrator may waive the screening requirements for similar low impact uses. As a part of a conditional use permit and/or site plan approval, screening may also be required where construction of a high impact use such as a correctional facility, truck terminal, intensive amusement business, mini warehouse, warehouse, industry, resource extraction, gas station, automobile repair, or salvage yard, is to occur adjacent to a less intensive use such as, a bank, office, clinic, funeral home, cemetery, personal care business, restaurant, church or school.
>
> C. Screening Design Standards. Screening barriers shall consist of a visually solid fence six feet in height constructed along the length of the property line adjacent to the use to be screened. However, no screen shall extend any closer to the front property line than 15 ft. Fence framing members shall face the commercial property to be screened. Landscaping in the form of evergreen shrubs may be substituted for the fence, and if so shall reach a minimum height of 6 feet within three years of planting. Shrubs planted on berms may have a lesser height provided the combined height of the berm and planting meets or exceeds those specified above. Shrubs shall be planted not greater than 4 feet apart. Existing trees and shrubs may also count towards satisfying the screening requirements, provided they meet the standards specified herein. Perimeter plantings required for parking lot landscaping may be counted towards satisfying the screening requirements of this section provided they otherwise meet the design requirements. Alternative screening plans may be approved by the Land Code Administrator provided they meet or exceed the standards contained herein.
>
> D. Maintenance. Plant materials that have died or portions of the fence which have become damaged shall be replaced within 30 days.

7.

An application for a Commercial Certificate of Occupancy was made by Fortenberry with Wiggins in July of 2015. (**Exhibit A**). It was the intent of Fortenberry to operate a personal care

home on the Property. An inspection was performed by Misha Parker (hereinafter "Parker"), Land Code Administrator for Wiggins, on July 22, 2015. No mention was made of a requirement that a 6 foot fence be installed around the perimeter of the property, yet the Certificate of Occupancy was not issued.

8.

On September 10, 2015, at the request of Parker, Fortenberry met with Parker and Wiggins' Chief of Police, Matt Barnett (hereinafter "Chief Barnett"), at the property along with Fortenberry's landlord, Doug Prentiss. Another walk-through was performed. Parker advised Fortenberry that a conditional Certificate of Occupancy would be issued the next day, September 11, 2015. During this second inspection, when Misha Parker mentioned to Chief Barnett the issue of whether a fence would be required, Chief Barnett advised that he did not see a reason why a fence would be necessary because of the trees around the perimeter of the property. Chief Barnett also stated that if there was a fence around the property, there would have to be a gate and the gate would have to remain unlocked as it would be against the law to confine the residents of the home. The knowledge of Chief Barnett is imputed to Wiggins. Parker was also advised by Derrick McInnis, Safety Consultant with the State of Mississippi, that the State did not require that the property be fenced.

9.

On September 15, 2015 in response to Fortenberry's application, Wiggins, through its Land Code Administrator Parker, sent a letter to Fortenberry advising that an inspection was made of the Property and that a "visually solid fence 6 feet in height constructed along the length of the property line adjacent to the use to be screened" would be required before a Certificate of Occupancy would be issued (**Exhibit B**). This letter only partially cited Section 5.3.7 of Wiggins' Land Development Code. Wiggins intentionally left out all language which allowed existing trees or shrubbery as an alternative buffer as opposed to fencing.

10.

On September 23, 2015, Fortenberry appealed the decision of Wiggins to the Planning Commission. Fortenberry was forced to participate in a public hearing before the Planning Commission on October 5, 2015 wherein the issuance of the Certificate of Occupancy was placed on the meeting agenda (**Exhibit C**). The following members of the Planning Commission were present: Christina Davis, Johnnette Dees, Charles Marteen, Ron Purvis and Douglas Smith. Also present was the Land Code Administrator, Misha Parker. In a 4 – 1 vote, the Planning Commission voted to uphold the Land Code Administrator's decision to deny the Certificate of Occupancy to Fortenberry. Those voting in favor of the denial were: Johnnette Dees, Charles Marteen, Ron Purvis and Doug Smith (**Exhibit D**). Fortenberry was not afforded complete and impartial treatment. From the discussions which took place at the Planning Commission meeting, it was apparent that discriminatory standards were being applied. There is no reasonable basis for the denial of the Certificate of Occupancy; there is no legal basis for the process which Fortenberry was forced to endure.

11.

On October 7, 2015, Fortenberry submitted a letter of appeal to the Wiggins Board of Alderman (**Exhibit E**). A meeting of the Board of Alderman took place on October 20, 2015 (**Exhibit F**). Present were Mayor Joel Miles, and Alderman Darrell Berry, Ron Dyal and George P. Smith. The discriminatory intent of Wiggins became quickly obvious as the Board of Alderman continuously questioned Fortenberry about the quality of the residents she planned on housing on the Property, which has nothing to do with whether existing trees and shrubbery are present so as to comply with the Ordinance requiring a buffer zone. Fortenberry was interrogated by Wiggins through its Board of Alderman regarding whether the residents were ambulatory, could care for themselves, knew right from wrong, suffered from Alzheimers, would be allowed to walk around

outside, would be allowed to leave the property and walk through adjoining neighborhoods, their mental and physical capacity, and their competency to make decisions.

12.

Fortenberry was also bombarded with questions concerning how many staff members would be present at all times, whether the staff would be able to control the residents, whether the existing trees created a sufficient barrier so as to prevent the residents from leaving the property, and who would be liable if a resident escaped from the Property and got run over by a car. None of these issues are relevant to whether an adequate buffer zone was present on the Property. In fact, the Board of Alderman did not ask any questions regarding the trees and shrubs which were located on the Property.

13.

After a hearing on the matter, Alderman Dyal made a motion that the appeal be denied and supported his motion by stating that Fortenberry's request for a Commercial Certificate of Occupancy would violate the Wiggins Land Development Code as pointed out by Parker during the hearing. George P. Smith seconded the motion. After a discussion and unanimous vote, it was so ordered (**Exhibit G**). On October 26, 2015, Wiggins sent a letter to Fortenberry advising her that the Board of Alderman had voted to uphold the Planning Commission decision to deny Fortenberry a Certificate of Occupancy (**Exhibit H**).

14.

Section 4.6.2 of the Ordinance speaks to the issuance of certificates of occupancy and states that "the land code administrator shall determine if the application is complete and shall issue a certificate only if the proposed construction and use is in compliance with the provisions of this ordinance..." The Property was in compliance and the Certificate of Occupancy should have been granted. Article 5 of the Ordinance is titled Supplementary Regulations and Design Standards. Subsection 5.3 is titled Commercial Design Standards. Section 5.3.7 of the Ordinance is titled

Required Screening for the Protection of Residential Areas. Subsection A speaks to the intent of the ordinance and states: This section requires screening to be provided and maintained when nonresidential uses are being developed or expanded adjacent to residential uses and when higher density residential uses are being developed or expanded adjacent to lesser density residential uses. Subsection B provides that all commercial uses which are located adjacent to a lot zoned R1 shall be provided with screening conforming to the design standards outlined below. Subsection C speaks to these screening design standards. This section states that screening barriers may consist of a visually solid fence 6 feet in height constructed along the length of the property line adjacent to the use to be screened or landscaping in the form of evergreen shrubs may be substituted for the fence, and if so should reach a minimum height of 6 feet within three years of planting. The ordinance further provides that existing trees and shrubs may also count toward satisfying the screening requirements.

15.

It is undisputed that the Property is screened on all four sides by existing trees and shrubs that meet the standards specified in the Ordinance and that a 6 foot fence was not required. It is also undisputed that the purpose of the Ordinance was to provide screening between residential and commercial areas, not to lock up disabled individuals with mental and physical disabilities and prevent them from leaving the Property. In fact, federal law requires that residents be free to come and go without restriction. The issues which Wiggins focused on were not relevant to the issuance of the Certificate of Occupancy.

16.

Fortenberry later discovered that on July 14, 2014, a prior lessee of the Property, Randale Brandon, had applied for a Certificate of Occupancy for the same building and for the same purpose and was denied as well due to the lack of a fence, establishing a pattern of discriminatory conduct on behalf of Wiggins. The letter sent to Brandon is discriminatory on its face, expressly stating that

due to "ongoing issues with the safety of the residents and surrounding public, a fence will be required around the property."

17.

Fortenberry timely appealed the decision of Wiggins to the Circuit Court of Stone County, but elected not to pursue that appeal.

18.

Fortenberry incurred significant economic damages that are ongoing. Fortenberry further incurred noneconomic damages, including but not limited to mental anguish, emotional distress, anxiety and other damages to be proven at trial.

## TITLE II OF AMERICANS WITH DISABILITIES ACT

19.

Title II of the ADA prohibits disability discrimination in all activities of local government entities, including zoning decisions. See 42 U.S.C. § 12132; 28 C.F.R. § 35.130. Wiggins is a public entity under the ADA and subject to the ADA's nondiscrimination mandate. See 42 U.S.C. § 12131; 28 C.F.R. § 35.104. This nondiscrimination mandate requires Wiggins to provide equal services, programs, and activities to entities that serve individuals with disabilities and to ensure that Wiggins' zoning decisions do not discriminate against individuals with disabilities and entities associated with them.

20.

Through the application of its zoning ordinances, Wiggins promotes the segregation of individuals with disabilities in private facilities. See 28 CFR §35.130(b)(1) prohibiting a public entity from discriminating "directly or through contractual or other arrangements, on the basis of disability," and §35.130(b)(2) prohibiting a public entity from "directly or through contractual or other arrangements, utilizing criteria or methods of administration" that have the effect of discriminating on the basis of disability. C.F.R. Part 35, Subpart F.

21.

For the reasons stated herein and to be shown at trial, Fortenberry's rights under the ADA were violated and Fortenberry is entitled to compensation and/or restitution as an aggrieved person or entity associated with providing services to those with disabilities or perceived disabilities. Fortenberry was damaged directly thereby and makes claim for all damages allowable under federal law.

22.

Wiggins discriminated against Fortenberry because of the known actual and perceived mental and physical impairments of the residents to be housed at the Property with whom Fortenberry had a known association in violation of the ADA. Fortenberry sought to operate in a zone allowing such facilities and should have been granted the Certificate of Occupancy. Instead, Wiggins denied Fortenberry's Certificate of Occupancy application and subjected Fortenberry to public hearings even though Fortenberry met the requirements imposed by the Ordinance.

23.

Wiggins denial of Fortenberry's Certificate of Occupancy based on impermissible assumptions and unfounded stereotypes about residents because of their disabilities violates the ADA. Fortenberry is therefore an aggrieved person under the ADA, as are those individuals harmed by Wiggins' discriminatory actions. See 42 U.S.C. § 12133; see also 29 U.S.C. § 794a (the remedies, procedures. and rights of which are incorporated into Title II by reference); 42 U.S.C. § 2000d-2. 2000e-5 (incorporated to 29 U.S.C. § 794a by reference).

24.

Due to the discriminatory actions of Wiggins, Fortenberry was prevented from opening a personal care home on the Property. Wiggins ignored its own ordinance, past practices, and relevant evidence when it required Fortenberry to go through the hearing process and again when it denied Fortenberry's application for a Certificate of Occupancy. As a result, Wiggins created a

precedent for singling out certain facilities that house individuals with physical and mental disabilities and applying a heightened requirement for them to locate in Wiggins. Wiggins' actions also perpetuated the stigma surrounding mental health disorders.

25.

Due to their professional association with persons with disabilities, Fortenberry is a covered person protected by the ADA, as are other persons or entities associated with Fortenberry and its residents. See 42 U.S.C. § 12133; 28 C.F.R. § 35.130(g); see also 28 C.F.R., pt. 35, App. A. Wiggins discriminated against Fortenberry because of their association with individuals with disabilities and, in the process, prevented the Property from being rented for a permitted use based on discriminatory reasons. Wiggins' provided unequal services to, and made a decision that had the effect of discriminating against Fortenberry and those associated with Fortenberry because they intended to serve individuals with known disabilities. Wiggins thus violated the ADA when it denied Fortenberry's certificate of occupancy.

## EQUAL PROTECTION AND SUBSTANTIVE DUE PROCESS – 42 U.S.C. 1983

26.

Wiggins has deprived Fortenberry of their federal constitutional and/or statutory rights by failing and refusing to provide Fortenberry with a Certificate of Occupancy. Wiggins acted under the color of state law when it deprived Fortenberry of their federal rights, property interests and otherwise discriminated against Fortenberry based upon the disability of the proposed residents.

27.

As a direct and proximate result of Wiggins' violation of 42 U.S.C. §1983, Fortenberry has sustained injuries and damages.

28.

For the reasons stated herein and to be further shown at trial, including but not limited to interference with actual protected property rights, Fortenberry's substantive due process rights, including but not limited to those under the Fifth and Fourteenth Amendments to the United States Constitution, were directly violated by Wiggins' actions, omissions and statutory violations, for which they make claim against Wiggins. Fortenberry was directly damaged thereby and makes claim for all damages allowable under federal law.

29.

For the reasons stated herein and to be shown at trial, Fortenberry's rights under the Equal Protection Clause were directly violated by Wiggin's actions, omissions and statutory violations, in that they were treated differently from similarly situated persons and entities, with no legitimate or rational basis for such differential treatment. Further, Wiggins attempted to enforce its Ordinance selectively in violation of the Equal Protection Clause for improper reasons, including but not limited to discriminatory reasons and the desire to prevent the exercise of a constitutional right. Fortenberry was directly damaged thereby and makes claim for all damages allowable under federal and law.

## FAIR HOUSING AMENDMENTS ACT OF 1988 42 U.S.C. §§ 3601-3631

30.

The Act prohibits intentional discrimination; it also prohibits other forms of discrimination in zoning, including discriminatory classification of persons with disabilities; zoning laws which, although neutral on their face, have a "disparate impact," i.e., a discriminatory effect, on persons with disabilities; and the failure of municipal officials to reasonably accommodate the needs of persons with disabilities. When the land use law or zoning decision is the result of an intention to discriminate against people with disabilities, it violates the FHAA.

31.

Denial of the Certificate of Occupancy was a result of intentional discrimination by Wiggins. Statements by decision-makers reflected that the decision was based on the identity of the residents and that the legitimate reasons advanced by Wiggins (e.g., safety concerns) were pretextual since Wiggins allowed shrubbery buffer zones for other commercial property owners.

32.

Wiggins has engaged in: (a) A pattern or practice of resistance to the full enjoyment of rights granted by the Fair Housing Act, in violation of 42 U.S.C. § 3614(a) and (b) A denial to a group of persons rights granted by the Fair Housing Act, which denial raises an issue of general public importance, in violation of 42 U.S.C. § 3614(a).

33.

For the reasons stated herein and to be shown at trial, Fortenberry's rights under the Act were violated and Fortenberry is entitled to compensation and/or restitution as an aggrieved person or entity associated with providing services to those with disabilities or perceived disabilities. Fortenberry was damaged directly thereby and makes claim for all damages allowable under federal law.

## SECTION 504 OF THE REHABILITATION ACT

34.

Section 504 of the Rehabilitation Act prohibits recipients of federal funding from subjecting persons with disabilities to discrimination. Wiggins receives federal funding. Wiggins has violated Section 504 of the Rehabilitation Act by discriminately applying the Ordinance.

35.

Denial of the Certificate of Occupancy was a result of intentional discrimination by Wiggins. Statements by decision-makers reflected that the decision was based on the identity of the

residents and that the legitimate reasons advanced by Wiggins (e.g., safety concerns) were pretextual since Wiggins allowed shrubbery buffer zones for other commercial property owners.

36.

Wiggins' violations have harmed Fortenberry and will continue to harm Fortenberry in the future. Wiggins knew or should have known that its conduct was directed to persons with disabilities.

37.

For the reasons stated herein and to be shown at trial, Fortenberry's rights under the Act were violated and Fortenberry is entitled to compensation and/or restitution as an aggrieved person or entity associated with providing services to those with disabilities or perceived disabilities. Fortenberry was damaged directly thereby and makes claim for all damages allowable under federal law.

## DAMAGES

38.

The actions, inactions, breaches and acts and violations of duty by Wiggins were the proximate cause of damages suffered by Fortenberry. At all times mentioned herein, damages suffered by Fortenberry were directly and proximately caused by the actions, inactions, breaches of duties and negligence of Wiggins.

39.

Taking into consideration, damages of every nature and kind which Fortenberry may recover from Wiggins herein, Fortenberry has been damaged in an amount to be proven in trial, but not less than $250,000.00.

## PUNITIVE DAMAGES

40.

At all times mentioned herein, Wiggins acted with actual malice and/or gross negligence which evidenced a willful, wanton, or reckless disregard for others, or committed actual fraud, and such actions were so oppressive and overbearing that in order to punish the wrongdoer and deter similar misconduct in the future, Wiggins should be subject to punitive damages consistent with the statutory scheme in the State of Mississippi. Wiggins knew or should have known that the effect of their actions constituted discrimination against a protected class. Specifically, after considering Wiggins' financial condition and net worth, the nature and reprehensibility of Wiggins' wrongdoing, Wiggins' awareness of the amount of harm being caused, and Wiggins' motivation in causing such harm, the duration of Wiggins' misconduct and attempts to conceal such misconduct, and Miss. Code Ann. § 11-1- 65, Wiggins should be subject to punitive damages in an amount to be proven at trial and decided by the jury.

## ATTORNEYS FEES AND EXPENSES

41.

A prevailing party under the ADA, FHA, the Rehabilitation Act and §1983 is entitled to an award of attorney's fees for all time that was reasonably expended in pursuit of the ultimate result achieved. As a result of the actions of Wiggins herein, Wiggins should be liable to Fortenberry for all of its attorney's fees, costs and expenses incurred, in attempting to right the wrongs caused by Wiggins, which are continuing in nature.

## PREJUDGMENT INTEREST

42.

Fortenberry is due prejudgment interest on all damages incurred.

WHEREFORE, PREMISES CONSIDERED Fortenberry demands judgment of and from Wiggins as follows:

(a) Compensatory damages for past, present and future economic damages suffered or to be suffered by Plaintiffs, both economic and noneconomic;

(b) Prejudgment interest;

(c) Attorney's fees and expenses;

(d) Punitive damages; and

(e) Such other relief as may be proper under the premises.

Respectfully submitted this ___19th___ day of August, 2016.

RUSHING & GUICE, P.L.L.C.

Attorneys for Plaintiffs

BY: _____
MARIA MARTINEZ MSBN 9951
WILLIAM LEE GUICE III MSBN 5059
P.O. BOX 1925
BILOXI MS 39533-1925
Voice: 228-374-2313   Fax: 228-875-5987
mmartinez@rushingguice.com
bguice@rushingguice.com